IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MATTHEW KAGUYUTAN,               )
       Petitioner,               )
                                 )
       vs.                           )          Civil Action No. 2:08-1022
                                 )          Magistrate Judge Lisa Lenihan
GERALD L. ROZUM, Superintendent at   )
SCI-Somerset, et al.,                 )
       Respondents.               )

<u>MEMORANDUM OPINION</u>

Petitioner, Matthew Kaguyutan, who is currently incarcerated at the State Correctional
Institution at Somerset, Pennsylvania, brings this counseled petition for a writ of habeas corpus
in accordance with 28 U.S.C. § 2254, challenging his convictions at Nos. CC  200015547 and
200016816 on charges of criminal homicide, arson, burglary, recklessly endangering another
person, criminal mischief and risking a catastrophe and the sentence of life imprisonment plus a
term of 27.5 to 55 years, imposed on September 20, 2002 in the Court of Common Pleas of
Allegheny County, Pennsylvania.  The charges arose out of the September 29, 2000 death of
Joseph Marcinek, who perished in an apartment building fire Petitioner set in an attempt to
frighten and/or injure his former girlfriend, Carissa Probst.

For the reasons that follow, Petitioner's claim that the trial court erred in denying him an
opportunity to offer expert testimony concerning false confessions (claim A) cannot be
considered, either because it involves a state law issue regarding the admissibility of evidence
rather than an issue cognizable in federal habeas corpus or (to the extent he is raising a new
claim here) because it is unexhausted and procedurally defaulted and barred from review.  His
remaining claims are as follows: trial counsel was ineffective for failing to introduce evidence to
demonstrate that information in his confession was false (claim B(1)), trial counsel was

ineffective for failing to introduce available evidence to demonstrate that the state's key witness testified falsely as to motive and that the state's theory of the case and that someone else was threatening the witness (claim B(2)), trial counsel was ineffective for failing to submit available evidence to show that he had an alibi for an incident of vandalism that occurred in June 2000, which would have helped discredit the state's theory of the case (claim B(3)), trial counsel was ineffective for failing to call available character witnesses to establish his non-violent reputation (claim C), and trial counsel was ineffective for failing to object when no jury instruction informed the jury that it could disregard the confession if it was not voluntarily entered (claim D).  These claims will be denied on the merits.  In addition, his request for an evidentiary hearing will be denied.

Procedural History

Petitioner was charged by two Criminal Informations filed in the Court of Common Pleas of Allegheny County, Criminal Division.  At No. CC 200015547, he was charged with one (1) count of criminal homicide.  (Answer Ex. 2.)[1]  At No. CC 200016816, he was charged with one (1) count each of arson, burglary, risking catastrophe, criminal mischief, and recklessly endangering another person.  (Answer Ex. 4.)

On May 7, 2001, Petitioner, through Gary E. Gerson, Esquire, filed an Omnibus Pre-Trial Motion, in which he sought to suppress statements he provided to police and evidence seized after he was arrested.  (Answer Ex. 5.)  On July 10, 2001, Petitioner appeared before the Honorable W. Terrence O'Brien for an evidentiary hearing on the Motion to Suppress, represented by Attorney Gerson.  On July 11, 2001, Judge O'Brien denied the motion.  (Answer

---

[1]     Docket No. 8.

Ex. 11.)

On July 11, 2001, Petitioner, through Attorney Gerson, filed a Motion In Limine, in which he sought to limit the Commonwealth from cross-examining him on anything other than the circumstances surrounding the confession if he took the stand at trial.  (Answer Ex. 12.)  On April 4, 2002, Petitioner appeared before Judge O'Brien for an argument on the Motion in Limine.  On April 16, 2002, Judge O'Brien issued an Order of Court setting forth the parameters of Petitioner's testimony.  (Answer Ex. 14.)  On April 25, 2002, Judge O'Brien recused himself and the case was reassigned to the Honorable Lawrence J. O'Toole.

On May 7, 2002, the Commonwealth filed a Commonwealth's Expert Report by Professor Paul G. Cassell.  (Answer Ex. 15.)  On May 8, 2002, Commonwealth filed a Motion to Preclude Proposed Testimony On 'False Confession' Phenomenon by Richard Leo, Ph.D. (Answer Ex. 16.)  On May 9, 2002, Petitioner, through Attorney Gerson, filed a Motion to Exclude Expert Witness Testimony of Paul G. Cassell.  (Answer Ex. 17.)

On May 8 and 9, 2002, Petitioner, represented by Attorney Gerson, appeared before Judge O'Toole for a <u>Frye</u> hearing.  Following the hearing, the matter was taken under advisement.  The parties submitted briefs.  (Answer Exs. 18, 19.)  On June 18, 2002, Judge O'Toole issued an Order of Court holding that expert testimony on the subject of police interrogation techniques and false confessions would not be allowed.  (Answer Ex. 20.)

On July 3, 2002, the Commonwealth filed a Submission of Notice of Intent to Introduce "Other Crime, Wrongs, or Acts" of the Defendant Pursuant to Pa.R.E. 404(b). (Answer Ex. 21.) On July 8, 2002, Petitioner, through Attorney Gerson, filed a Motion to Exclude Proposed

Testimony on Language and Grammar Patterns by Michelle Dresbold.  (Answer Ex. 22.)[2]  On

July 9, 2002, Petitioner, through Attorney Gerson, filed a Motion In Limine to preclude the

Commonwealth from offering evidence of "other crimes, wrongs or acts."  (Answer Ex. 23.)

On July 15, 2002, Petitioner appeared before Judge O'Toole for a jury trial, represented

by Attorney Gerson.  On July 19, 2002, Petitioner was found guilty of second degree murder and

all remaining charges.

On September 19, 2002, Petitioner, through Attorney Gerson, filed a Motion for

Post-Verdict Relief.  (Answer Ex. 25.)  On September 20, 2002, Petitioner appeared before

Judge O'Toole for sentencing, still represented by Attorney Gerson.  At CC 200015547, Count

1, second degree murder, petitioner was sentenced to life imprisonment.  At CC 200016816,

Count 1, arson, he was sentenced to a term of incarceration of not less than ten (10) nor more

than twenty (20) years, consecutive to CC 200015547.  At Count 2, burglary, he was sentenced

to a term of incarceration of not less than ten (10) nor more than twenty (20) years, consecutive

to Count 1.  At Count 3, risking a catastrophe, he was sentenced to a term of incarceration of not

less than seven and one half (7½ ) nor more than fifteen (15) years, consecutive to Count 2.

Petitioner received no further penalty at the remaining counts.  Thus, Petitioner's aggregate

sentence was a term of life imprisonment and consecutive term of incarceration of not less than

twenty-seven and one half (27½ ) nor more than fifty-five (55) years.

On September 30, 2002, Petitioner, through Attorney Gerson, filed a Post-Sentence

Motion.  (Answer Ex. 26.)  On October 10, 2002, Paul G. Kay, Esquire entered his appearance

---

[2]   This motion was resolved before trial began on July 15, 2002.  The court heard testimony
from Ms. Dresbold and the arguments of counsel and Judge O'Toole granted Petitioner's motion
to preclude her from testifying as an expert witness, although she was allowed to offer general
statements about similarities.  (T.T. 43.)

on behalf of Petitioner.  On November 7, 2002, Petitioner, through Attorney Kay, filed a

Supplemental Motion for Post Verdict Relief.  (Answer Ex. 27.)  On December 23, 2002,

Petitioner, through Attorney Kay, filed a Defendant's Brief in Support of Post Verdict Motions.

(Answer Ex. 28.)[3]

On January 13, 2003, Petitioner appeared before Judge O'Toole for an evidentiary

hearing on his post-sentence motions, represented by Attorney Kay.  At the hearing, Attorney

Gerson was questioned about his trial decision not to call character witnesses to testify as to

Petitioner's reputation in the community for being nonviolent.

On January 21, 2003, Petitioner, through Attorney Kay, filed a document titled

"Supplemental Brief of Defendant Matthew Kaguyutan on the Issue of Trial Counsel's

Ineffectiveness for Failure to Call Character Witnesses for the Trait of Reputation for

Peacefulness and Non-Violence."  (Answer Ex. 30.)  On January 24, 2003, Judge O'Toole

denied the post-sentence motions. (Answer Ex. 32.)

On February 7, 2003, Petitioner, through Attorney Kay, filed a Notice of Appeal.

(Answer Ex. 33.)  In his brief, which was filed in the Superior Court on September 30, 2003 and

docketed at No. 269 WDA 2003, he raised the following issues:

> 1. Whether the trial court erred in rejecting defendant's claim that trial counsel
> was ineffective for failing to call character witnesses to establish defendant's
> reputation for peacefulness and non-violence when numerous such character
> witnesses were available, trial counsel knew they were available, and was unable
> to offer any rational, strategic reason for failing to offer character witnesses in an
> arson/homicide in which the Commonwealth consistently maintained that the
> defendant intentionally set the fire in an effort to stalk, menace, and/or frighten
> his ex-girlfriend.
>
> 2. Whether the trial court erred by denying defendant an opportunity to offer the

---

[3]      Docket No. 9.

testimony of false confession expert Dr. Richard Leo to explain the phenomenon of false confessions to the jury when defendant consistently maintained his innocence and claimed he gave a false confession to the police in this case.

3. Whether the trial court erred in permitting the Commonwealth to offer the testimony at trial of Michelle Dresbold, a language pattern specialist, to support its contention that the defendant was the arsonist, as the arsonist wrote letters to Carissa Probst after the fire and those letters according to Ms. Dresbold, were "substantially similar" to known writings of the defendant, when the court rejected Ms. Dresbold as an expert, but then permitted her testimony complete with detailed references to her Secret Service training in language patterns thereby making her a de facto expert in the eyes of the jury.

4. Whether the trial court erred in permitting the Commonwealth to offer into evidence defendant's confession in violation of the corpus delicti rule when there was no other evidence in the case against the defendant and when there was no evidence that defendant was at the crime scene on the day of the fire; there were no witnesses who saw defendant at the crime scene the day of the fire; the lack of proof of the incendiary nature of the fire; and the failure to scientifically link the defendant to the fire.

5. Whether the suppression court erred in denying defendant's motion to suppress when the oral and written statements taken from the defendant were obtained after defendant had requested to speak with counsel and his arrest was without probable cause in violation of Article I, Sections 8 and 9 of the Pennsylvania Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

6. Whether the Suppression court erred in ruling that defendant would subject himself to cross-examination involving whether the handwritten notes of Detective Richard McDonald, which appear on defendant's confession, were in fact the words of the defendant, when defendant's sole purpose in testifying was the voluntariness of his confession, all of which was in violation of defendant's right against self-incrimination under Article I, Sections 8 and 9 of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

(Answer Ex. 38 at 5-6.)

On November 3, 2004, the Superior Court affirmed the judgment of the Court of

Common Pleas of Allegheny County. (Answer Ex. 40.)

On December 1, 2004, Petitioner, through Attorney Kay, filed a Petition for Allowance

6

of Appeal in the Supreme Court of Pennsylvania, which was docketed at No. 616 WAL 2004.  In

his petition, Petitioner raised the following claims:

> I. Did the Superior Court err in failing to find that defendant was prejudiced by trial counsel's ineffectiveness for failing to call available character witnesses, who were known to trial counsel, to establish defendant's reputation for non-violence and peacefulness when the case involved an arson/homicide where the Commonwealth sought to portray defendant as a violent, remorseless stalker who continued to threaten to kill his intended victim after an innocent bystander had died in the arson and counsel's strategic reason for not calling character witnesses was incredible belief that "violence was not in the case."

> II. Did the Superior Court err in supporting the trial court's refusal to permit the defendant to offer the expert testimony or Dr. Richard Leo on the phenomenon of false confessions when this testimony would have educated the jury regarding the factors and circumstances which tend to produce false confessions and other jurisdictions, including some Pennsylvania courts, have permitted Dr. Leo to give this expert testimony on the subject of false confessions.

> III. Did the Superior Court err in finding that defendant waived his claim that the trial court improperly permitted Commonwealth witness, Michelle Dresbold, to testify as a de facto expert witness on the issue of language pattern and grammatical styles because trial counsel, who filed a Motion In Limine objecting to this testimony, failed to make a second objection when the trial court, permitted the witness to testify to the substantial similarities between known writings of defendant and the post-fire writings of the arsonist but not give her ultimate opinion as an expert.

(Answer Ex. 42 at 3.)  On August 17, 2005, the Supreme Court denied the petition.  (Answer Ex.

43.)

On August 7, 2006, Petitioner, through Mark Rubenstein, Esquire, filed a Motion for

New Trial Pursuant to the Pennsylvania Post Conviction Relief Act, 42 Pa. C.S. §§ 9541-46

(PCRA).  (Answer Ex. 44.)[4]  In his motion, Petitioner raised the following claims:

> 1. Trial counsel provided ineffective assistance of counsel for failure to utilize available evidence to establish the false nature of the testimony of Carissa Probst.

---

[4]      Docket No. 10.

2. Trial counsel provided ineffective assistance of counsel for failure to properly investigate and introduce an available alibi defense.

3. Trial counsel provided ineffective assistance of counsel for failure to present substantial evidence that defendant's alleged confession was false.

4. Trial counsel provided ineffective assistance of counsel for failure to correct erroneous jury instructions and procedures.

5. Defendant's sentence has been erroneously computed and he has not received credit for time served.

6. Appellate counsel provided ineffective assistance of counsel in his failure to raise meritorious claims.

(Answer Ex. 44 at 3, 6, 7, 11, 13, 14.)  On October 2, 2006, Judge O'Toole issued a Notice of Intent to Dismiss. (Answer Ex. 46.)  On October 20, 2006 Attorney Rubenstein filed a Response to Trial Court Notice of Intention to Dismiss Motion for New Trial Pursuant to the Post Conviction Relief Act. (Answer Ex. 47.)  On October 24, 2006, Judge O'Toole dismissed the petition.  (Answer Ex. 48.)

On November 3, 2006, Petitioner, through Attorney Rubenstein, filed a Notice of Appeal in the Pennsylvania Superior Court.  (Answer Ex. 49.)  In his brief, filed on April 5, 2007 and docketed at No. 2239 WDA 2006, Petitioner raised the following issues:

I. Is Mr. Kaguyutan eligible to obtain relief under the Post Conviction Relief Act?

II. Did trial counsel render ineffective assistance of counsel when he failed to utilize available evidence to establish the false nature of Carissa Probst's testimony?

III. Was trial counsel ineffective for failing to properly investigate an available alibi defense and introduce Michelle Kaguyutan as a witness who would have established that Mr. Kaguyutan could not have committed the June 28, 2000 vandalism at Ms. Probst's parents residence?

IV. Did trial counsel provide ineffective assistance of counsel when he failed to present substantial evidence that demonstrated Mr. Kaguyutan's confession was false?

V. Did trial counsel provide ineffective assistance of counsel when he failed to object and correct the lower court's erroneous jury instructions?

VI. Did trial counsel provide ineffective assistance of counsel when he failed to object and actually agreed with the jury's request to read Detective McDonald's notes of Mr. Kaguyutan's alleged confession during deliberation in the courtroom?

VII. Did the lower court abuse its discretion in denying Mr. Kaguyutan's motion for new trial pursuant to the Post Conviction Relief Act without a hearing insofar as Mr. Kaguyutan presented issues that would have entitled him to relief?

(Answer Ex. 53 at 4)  On August 28, 2007, the Superior Court affirmed the judgment of the

Court of Common Pleas, but vacated Petitioner's sentence for the arson conviction on the ground

that it was the predicate felony for the murder conviction and imposing multiple punishments for

the two crimes is prohibited.  (Answer Ex. 55.)

On September 26, 2007, Petitioner, through Attorney Rubenstein, filed a Petition for

Allowance of Appeal in the Supreme Court of Pennsylvania, which was docketed at No. 430

WAL 2007.  In his petition, Petitioner raised the following claims:

I. Did the Superior Court err in determining that the lower court did not abuse its discretion in finding that the claim that trial counsel rendered ineffective assistance when he failed to utilize available evidence to establish the false nature of Carissa Probst's testimony, lacked arguable merit?

II. Did the Superior Court err in affirming the lower court's finding that the claim that trial counsel was ineffective for failing to properly investigate an available alibi defense and introduce Michelle Kaguyutan as a witness who would have established that Mr. Kaguyutan could not have committed the June 28, 2000 vandalism at Ms. Probst's parents' residence, lacked arguable merit?

III. Did the Superior Court err in deciding that the lower court did not abuse its discretion in finding that the claim that trial counsel was ineffective when he failed to present substantial evidence that demonstrated Mr. Kaguyutan's confession was false, lacked arguable merit?

IV. Did the Superior Court err in affirming the lower court's finding that the claim that trial counsel was ineffective when he failed to object and correct the lower court's erroneous jury instructions, lacked arguable merit?

9

V. Did the Superior Court err in deciding that the lower court did not abuse its discretion in finding that the claim that trial counsel provided ineffective assistance when he failed to object and actually agreed with the jury's request to read Detective McDonald's notes of Mr. Kaguyutan's alleged confession during deliberations in the courtroom, lacked arguable merit?

VI. Did the Superior Court err in deciding that the lower court did not abuse its discretion in denying Mr. Kaguyutan's Post Conviction Relief Act petition without a hearing insofar as Mr. Kaguyutan presented issues that would have entitled him to relief?

(Answer Ex. 57 at 4.)  On July 10, 2008, the Supreme Court denied the petition. (Answer Ex. 58.)

Claims in Federal Habeas Petition

Petitioner filed this federal habeas corpus petition pro se on July 21, 2008 (Docket No. 1) and counsel (Attorney Rubenstein) filed an amended petition on his behalf on August 7, 2008 (Docket No. 5).  He raises the following claims:

A. The Pennsylvania courts entered a decision that was contrary to or an unreasonable application of clearly established Supreme Court case law in denying Mr. Kaguyutan an opportunity to offer expert testimony concerning false confessions.

B. The Pennsylvania courts entered a decision that was contrary to or an unreasonable application of clearly established Supreme Court case law in finding that counsel was effective despite failing to present available evidence to contradict the state's theory of the case.

[1]. Trial counsel failed to introduce available evidence to demonstrate that information in the so-called confession was false.

[2]. Trial counsel failed to introduce available evidence to demonstrate that the state's key witness testified falsely as to motive and the state's theory of the case, and that someone else was threatening that witness.

[3]. Trial counsel failed to submit available evidence to show Mr. Kaguyutan had an alibi for the June 2000 vandalism, which would have helped discredit the state's theory of the case.

C. The Pennsylvania courts entered a decision that was contrary to or an

10

unreasonable application of clearly established Supreme Court case law in finding that counsel was effective despite failing to call available character witnesses to establish his non-violent reputation.

D. The Pennsylvania courts entered a decision that was contrary to or an unreasonable application of clearly established Supreme Court case law in finding that counsel was effective despite contributing to a due process violation by failing to object when no jury instruction informed the jury it could disregard the confession if it were involuntarily entered.

E. Mr. Kaguyutan is entitled to an evidentiary hearing.

(Pet'r's Br. Support Am. Pet. at 7, 17-19.)[5]

Respondents filed an answer on August 27, 2008, in which they argue that two of the claims were presented as state law issues and the remaining claims should be denied on the merits (Docket No. 9). Petitioner filed a reply brief in support of the petition on September 25, 2008 (Docket No. 11).

Exhaustion

The first issue that must be addressed by a federal district court when considering a habeas corpus petition filed by a state prisoner is whether the prisoner has exhausted available state court remedies as required by 28 U.S.C. §§ 2254(b) and (c). The Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), provides that:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B)(i)  there is an absence of available State corrective process; or

---

[5]      Docket No. 4.  Respondents track this list of claims in the answer (Docket No. 8 at 17), as does Petitioner in his reply brief (Docket No. 11).

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28 U.S.C. § 2254(b).

It is well settled that, as a matter of comity, the state should be provided with the first opportunity to consider the claims of constitutional violations and to correct any errors committed in its courts.  Rose v. Lundy, 455 U.S. 509, 518 (1981); Preiser v. Rodriguez, 411 U.S. 475 (1973).  Accordingly, before a state prisoner's claims may be addressed by a federal habeas court, the constitutional issues must first have "been fairly presented to the state courts" for review.  Castille v. Peoples, 489 U.S. 346, 351 (1989) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)).   Both the factual and legal basis for the claim must have been presented to the state courts.  Thus, the Supreme Court held that "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  Duncan v. Henry, 513 U.S. 364, 366 (1995).

Procedural Default

The Court of Appeals has stated that:

As a matter of comity and federalism, a federal court cannot rule on the merits of a habeas petitioner's claims when a state court has found such claims to be procedurally defaulted pursuant to an independent and adequate state procedural rule unless the petitioner shows cause and prejudice for the default.

Kindler v. Horn, 542 F.3d 70, 78 (3d Cir. 2008) (citing Doctor v. Walters, 96 F.3d 675, 683 (3d

Cir. 1996)).  In addition, when habeas petitioners have not fairly presented their claims to the state courts and would be barred by a state procedural rule from seeking further relief, the claims cannot be reviewed because of this procedural default.  Lines v. Larkins, 208 F.3d 153, 160 (3d Cir. 2000) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)).  In Lines, the petitioner had filed a direct appeal to the Superior Court and a petition for allowance of appeal in the Pennsylvania Supreme Court.  He then filed a PCRA petition and after it was denied, he appealed to the Pennsylvania Superior and Supreme Courts.  However, the Court of Appeals concluded that he had not "fairly presented" to the Pennsylvania courts any of the claims that he was presenting in his habeas corpus petition.

The Court of Appeals did not affirm the district court's dismissal of the federal habeas corpus petition on the ground that Lines had failed to exhaust available state court remedies and that he should file another PCRA petition.  Rather, the court concluded that he had no more available state court remedies because the statute of limitations under the PCRA, 42 Pa. C.S. § 9545(b)(1), would prohibit him from filing any PCRA petition, including a second or subsequent petition, more than one year after the judgment becomes final unless certain exceptions are met, which did not apply to the case.  The court noted that the Pennsylvania Supreme Court had held in Commonwealth v. Banks, 726 A.2d 374 (Pa. 1999), that the time restrictions under the PCRA are jurisdictional.  Id. at 164 & n.17.  The court concluded that "[w]hen exhaustion is futile because state relief is procedurally barred, federal courts may only reach the merits if the petitioner makes the standard showing of 'cause and prejudice' or establishes a fundamental miscarriage of justice."  Id. at 166 (citation omitted).  Because the petitioner failed to meet either exception to the procedural bar, all of his claims were procedurally barred from review and the court dismissed the petition with prejudice.  Id. at 169.

Respondents contend that: 1) claims A and C were presented to the state courts as state law evidentiary issues only and are not cognizable in federal habeas corpus and to the extent that he raises federal issues here the claims are unexhausted and procedurally defaulted; and 2) claims B(1-3) and D are exhausted because they were presented to all levels of the Pennsylvania courts.

Claims A and C were presented to all levels of the Pennsylvania courts in the process of Petitioner's direct appeal and claims B(1-3) and D were presented to all levels of the Pennsylvania courts during his PCRA petition and appeal therefrom.  However, as Respondents note, claim A was presented to the state courts as a state law evidentiary issue.  Claim A alleges that the state courts erred as a matter of state law by not permitting him to offer the expert testimony of Dr. Richard Leo concerning the issue of false confessions.  With respect to this issue, the trial court accepted briefs and held a hearing pursuant to Frye v. United States, 293 F.2d 1013 (D.C. Cir. 1923), which was adopted as the law in Pennsylvania in Commonwealth v. Topa, 369 A.2d 1277 (Pa. 1977).  The court concluded that Dr. Leo's research and writing on the topic of false confessions as it relates to police interrogation techniques had not produced a valid scientific methodology.  The Superior Court agreed with this reasoning and also noted that Pennsylvania Rules of Evidence 802 "allows expert testimony only when it encompasses 'scientific, technical or other specialized knowledge beyond that possessed by a layperson' and will therefore assist the factfinder to understand the evidence or determine a fact in issue," but that such was not the case here.  (Docket No. 40 at 8.)  Finally, the Superior Court agreed with the trial court that Dr. Leo's testimony would invade the exclusive province of the jury to assess credibility.  (Id. at 9.)  Thus, this issue was presented to the Pennsylvania courts as an issue of state evidentiary law and decided as such.

14

"Admissibility of evidence is a state law issue."  Wilson v. Vaughn, 533 F.3d 208, 213 (3d Cir. 2008) (citing Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  As the Supreme Court recently reiterated, "we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"  Waddington v. Sarausad, 129 S.Ct. 823, 832 n.5 (2009) (quoting Estelle, 502 U.S. at 67-68).  Thus, claim A presents a state law issue involving the admission of evidence and it is not reviewable in federal habeas corpus.

Petitioner argues that, because the court relied on Frye, which was a federal case, federal law was invoked.  However, Pennsylvania evidence law is not federal law, regardless of whether it is based on the standard established in Frye.[6]  Petitioner cites no authority in support of this novel argument, and it is unavailing.  As cited above, numerous cases have held that state law evidentiary decisions are not cognizable in federal habeas corpus.  See Keller v. Larkins, 251 F.3d 408, 414 (3d Cir. 2001) (petitioner presented claim regarding trial court's admission of his membership in motorcycle gang and his wife's work as an informant as a state law evidentiary issue and court properly did not reach the merits of it).

To the extent that Petitioner alleges a violation of his right to due process arising out of this trial court failure, he did not present the state courts with this federal claim.  Thus, it is unexhausted and, because the time in which to file a PCRA petition alleging this claim has expired, it is also procedurally barred from review.  See Keller, 251 F.3d at 415.  The Court may not consider a procedurally barred claim unless Petitioner "can demonstrate cause for the default

---

[6]     In federal court, the admissibility of evidence is governed by the Federal Rules of Evidence and by Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), which do not set the same standard as the Frye standard.  See Blum ex rel. Blum v. Merrell Dow Pharms., Inc., 764 A.2d 1 (Pa. 2000) (recognizing the distinctions between the two tests but not deciding whether Daubert has superseded Frye in Pennsylvania).

and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  Petitioner has not argued that he can demonstrate "cause" for his procedural defaults, that he suffered "prejudice" therefrom, or in the alternative that he will suffer a "fundamental miscarriage of justice" if these claims are not heard.  Moreover, he would not meet the standard necessary to satisfy either exception to the procedural default bar in any event.

The issue of cause "ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  Because Petitioner's counsel did not raise these issues or raised them inadequately, he cannot refer to any source external to the defense.  Thus, he cannot establish the existence of "cause" to excuse the procedural default.

Even where no cause or prejudice can be shown, a federal court may grant a writ of habeas corpus where failure to hear the claim would result in a miscarriage of justice.  Sawyer v. Whitley, 505 U.S. 333, 339 (1992).  A fundamental miscarriage of justice occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent. Murray, 477 U.S. at 495-96; Hull v. Freeman, 991 F.2d 86, 91 n.3 (3d Cir. 1993).  To meet this standard, the prisoner must show a fair probability that, in light of all the evidence, including that claimed to have been illegally admitted and that claimed to have been wrongly excluded or which became available only after trial, the trier of fact would have entertained a reasonable doubt of his guilt.  Sawyer, 505 U.S. at 339 n. 5 (citing Kuhlmann v. Wilson, 477 U.S. 436, 454 n. 17 (1986)).  This exception is exceedingly narrow: "'To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.'  Given the rarity of such

16

evidence, 'in virtually every case, the allegation of actual innocence has been summarily rejected.'"  Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)).

In this case, Petitioner has not even alleged that he can meet the high burden of demonstrating a fundamental miscarriage of justice.  Therefore, the Court will not reach the merits of this claim.  Keller, 251 F.3d at 416.

Respondents also contend that claim C was presented to the state courts as a state law issue.  However, claim C alleges that counsel was ineffective for failing to call character witnesses to testify as to his reputation for being a non-violent person.  The Court of Appeals has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to the Supreme Court case setting forth the elements of an ineffective assistance of counsel claim, Strickland v. Washington, 466 U.S. 668 (1984).  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).  Thus, this claim has been exhausted and will be reviewed on the merits.

Facts of the Case

The trial court summarized the facts of the case as follows:

at approximately 6:35 am on September 29, 2000, Pittsburgh police officers were dispatched to a structural fire at 409 North Craig Street in Oakland.  Upon arrival, the police officers noticed that flames were coming from the second floor of the structure and heavy smoke was visible on the third floor.  The police and firefighters entered the building to rescue any occupants.  Justin Wag[o]ner, an occupant of the building, was found on the side of the house.  He said that he believed his roommate, Joseph Marcinek, was still inside of their third floor apartment.  The firefighters were unable to reach the apartment until approximately 7:11 am, where they found Joseph Marcinek dead.  ([T.T.] 104-113.)

Eight other occupants of the apartment building had escaped to safety.  Arson investigators ultimately determined that the fire had been deliberately set on the second floor of the apartment building.  (T.T. 129-174.)  Although no suspects were immediately identified by the police, about five days after the fire,

17

Carissa Probst, one of the occupants of the second floor apartment, received a threatening letter. The writer of the threat was anonymous. The writer casually mentioned the fire-related death and indicated that the victim should have been Ms. Probst. The author of the letter went on to state that next time, she would not survive. Ms. Probst contacted the police. After speaking with Ms. Probst, the police decided to interview her former boyfriend, [Matthew Kaguyutan]. (T.T. 282-284.)

[Kaguyutan] was question[ed] by Pittsburgh Police Homicide Detectives on October [5], 2000. At that time, [he] admitted that he intentionally set a fire inside of the second floor apartment at 409 North Craig Street. Jesse Vanko and Carissa Probst occupied that apartment. [He] admitted to the detectives that he had authored the threatening letter received by Ms. Probst following the fire. Additionally, [he] admitted that a few months before the fire, he had stolen the keys to Ms. Probst's apartment. He used these keys to gain entry, and then used a candle to start a fire in the common area of the apartment. [He] confessed that in addition to setting the fire, he had done other things to annoy, harass, or threaten Ms. Probst during the months since their breakup. The defendant performed these acts anonymously. It was apparently [his] hope that his actions would drive Ms. Probst to seek his comfort and assistance in facing the hazards that were coming her way. (T.T. 560-573.)

The police further investigated [Kaguyutan's] claim of harassment. It was revealed that Ms. Probst had broken off a relationship with [him] several months prior to the fire at the apartment building. Although [he] never issued threats, Ms. Probst believed that she was being stalked. Damage was done to landscaping at the home belonging to her mother and stepfather. Graffiti, threatening her by name, was sprayed on the walls at the property. A fire was set in an apartment shortly before Ms. Probst was due to move in. This apartment[] was located a short distance from 409 Craig Street. Nonetheless, Ms. Probst said that she never connected [him] to the earlier property damage. (T.T. 286-325.)

(Answer Ex. 36 at 4-6.)

<u>Standard of Review</u>

A petitioner is only entitled to federal habeas relief if he meets the requirements of 28

U.S.C. § 2254(d), which provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Section 2254(d) "firmly establishes the state court decision as the starting point in habeas review."  Hartey v. Vaughn, 186 F.3d 367, 371 (3d Cir. 1999).  This provision governs not only pure issues of law, but mixed questions of law and fact such as whether counsel rendered ineffective assistance.  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

The Supreme Court has held that, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  The Court has also held that

> the "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case.  In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced."  In order for a federal court to find a state court's application of our precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been "objectively unreasonable."

Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003) (other citations omitted)).  In other words, "the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citations omitted).

19

Section 2254(e) provides that:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Ineffective Assistance of Counsel

Petitioner's claims allege ineffective assistance of trial counsel.  The Supreme Court:

established the legal principles that govern claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   An ineffective assistance claim has two components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  Id., at 687, 104 S.Ct. 2052.  To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  Id., at 688, 104 S.Ct. 2052.  We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Ibid.

Wiggins, 539 U.S. at 521.

To satisfy the second prong of counsel ineffectiveness, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 534 (quoting Strickland, 466 U.S. at 694.)  The Court of Appeals has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland.  Werts, 228 F.3d at 204.  Thus, the relevant question is whether the decisions of the Pennsylvania courts involve an unreasonable application of Strickland.  Jacobs v. Horn, 395 F.3d 92, 106 n.9 (3d Cir. 2005).  See also Taylor v. Horn, 504 F.3d 416, 430 (3d Cir. 2007).  That is, a petitioner must show that the state courts "applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535

20

U.S. 685, 699 (2002).

The question is not whether the defense was free from errors of judgment, but whether defense counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Strickland, 466 U.S. at 689. "We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688).

<u>Failure to introduce evidence that his confession was false</u>

In claim B(1), Petitioner argues that trial counsel was ineffective for failing to introduce available evidence to demonstrate that his confession was false. Specifically, he contends that counsel had evidence, in the form of testimony by two witnesses (his brother, Michael Kaguyutan and his friend, Laura Jago), that would have further challenged the confession he allegedly made by demonstrating that he could not have consumed the alcoholic beverage that the Commonwealth alleges he stated he did the night of the crime (Yeagermeister) because the bars he visited did not carry that particular beverage.[7]

The PCRA court stated as follows:

A review of the transcripts of the pre-trial motions demonstrates that trial counsel vigorously pursued a defense that the Defendant's confessions were false. Trial counsel filed a Motion seeking suppression of the confession, which was denied by Judge O'Brien after a full hearing. Also, defense counsel sought to introduce the testimony of two expert witnesses on the issue of false confessions; however,

---

[7]     Petitioner has provided the affidavit of Michael Kaguyutan as an exhibit to his amended petition (Docket No. 5 Ex. C ). He had submitted this affidavit, along with that of Laura Jago, as exhibits to his PCRA petition. (Docket No. 44 Exs. C, G.) He has also submitted his own affidavit, in which he states that he told Attorney Gerson about numerous factual impossibilities and falsities in the police statement but counsel failed to pursue them. (Docket No. 5 Ex. B ¶¶ 6-7.)

after a pre-trial hearing, he was precluded from doing so via an Order of Court
ruling that the evidence was inadmissible.  Moreover, the trial testimony shows
that each of the pieces of evidence that the Defendant claims were false or not
introduced, were proven to be true or were introduced either on direct or cross
examination.  Accordingly, the Defendant has failed to prove this allegation and
the Court finds no ineffectiveness in this regard.

(Answer Ex. 51 at 5.)  The Superior Court affirmed on the basis of Judge O'Toole's opinion.

(Answer Ex. 55 at 5.)

Respondents argue that the proposed testimony by Michael Kaguyutan and Laura Jago as

to what the bar owners told them is inadmissible hearsay and thus trial counsel cannot be

deemed ineffective for failing to call them.  They also argue that trial counsel cannot be deemed

ineffective for failing to call the bar owners because Petitioner has made no demonstration that

they would have been available or aided his case.  Respondents note that, at the trial, several

witnesses testified that Petitioner was with them at Peter's Pub, the Attic and an after-hours club

on the night preceding the fire.  (T.T. 439-47, 732-33.)  This testimony was consistent with

Petitioner's confession.

Petitioner replies that Respondents have not cited any authority in support of their

argument concerning hearsay and that, even if the two witnesses he proposes could not have

testified, the bar owners themselves could have done so.  He also argues that the issue is not

where he was that evening but what drinks he ingested and thus the evidence would not have

been repetitive as to what several other witnesses said.

As noted by the state courts, trial counsel vigorously attacked both the voluntariness and

the details of Petitioner's alleged confession, first by cross-examining Detective McDonald and

then by having Petitioner testify himself.  Thus, even assuming that counsel's failure to call

witnesses to establish that he could not have told the police that he consumed Yeagermeister

22

because the bars did not carry this beverage fell below an objective standard of reasonableness, he has not demonstrated that he was prejudiced by this failure, namely that there is a reasonable probability that the result of the proceedings would have been different.

Petitioner has not demonstrated that the Superior Court's decision was an unreasonable application of Strickland. Therefore, as to this claim, the petition will be denied.

Failure to introduce evidence that Probst testified falsely

In claim B(2), Petitioner argues that his trial counsel was ineffective for failing to introduce available evidence to demonstrate that the state's key witness testified falsely as to motive and the state's theory of the case, and that someone else was threatening that witness. Specifically, Petitioner contends that counsel should have introduced his answering machine messages, which would have undermined the state's case by demonstrating that Carissa Probst continued to call him and leave messages with love songs for him even days before the fire, thus indicating that she did not believe he was stalking her.[8] He also argue that counsel failed to introduce evidence that someone else was making harassing phone calls to Ms. Probst.

The PCRA court stated that:

the Defendant claims that trial counsel should have questioned the witness about messages that she left on Defendant's telephone answering machine before the arson and about a *57 trace that the witness had on her telephone line in the summer of 2000. First, a review of the trial transcript demonstrates that trial counsel did, in fact, question Ms. Probst about the messages that she left on the Defendant's answering machine, including messages with love songs. ([T.T.] 404-405.) As such, contrary to this allegation, this evidence was presented to the jury for their consideration. Second, Ms. Probst's testimony on direct examination indicates clearly that she did not have a *57 trace put on her telephone line by the telephone company. She stated that she contacted the phone

---

[8]   Petitioner has attached a message log for his answering machine messages to his amended petition. (Docket No. 5 Ex. A.) He also argues about the relevance of these messages in his affidavit. (Docket No. 5 Ex. B ¶ 5.)

company to complain that she was getting annoying telephone calls, but the representative indicated that she needed "so many calls in a row in a certain amount of time" for them to place the trace on her line.  Accordingly, there would have been no reason for trial counsel to cross-examine the witness about a trace on her telephone line when she testified on direct examination that no such trace existed. For these reasons, the Court finds no ineffective assistance with regard to the testimony of Ms. Probst and this allegation is rejected.

(Answer Ex. 51 at 4.)  The Superior Court affirmed on the basis of Judge O'Toole's opinion.

(Answer Ex. 55 at 4-5.)

Respondents argue that the record reflects that Ms. Probst admitted to leaving these messages and further that she testified that, although she broke off their romantic relationship, she continued to consider Petitioner a close friend and rely on him for friendship and support. (T.T. 315-16, 363-64, 369.)  She also testified that she received phone calls during which the caller would not say anything but breathe.  However, she stated that she did not know who was making these calls, that she told Petitioner about these calls and he suggested that she press *69 to find out who the caller was and that some of these calls occurred when she was actually talking to Petitioner on the phone.  (T.T. 328-30, 372.)  When asked about testimony she had given at the coroner's inquest to the effect that she never felt that she was being stalked by Petitioner, never felt threatened by him and that generally his behavior toward her was normal, she responded "I was being stalked.  I didn't suspect Matt at the time I was being stalked."  (T.T. 352.)

Petitioner responds that physical evidence is desirable as being unbiased and objective and is even necessary to corroborate eyewitness testimony in certain types of cases.  However, the case he cites, United States v. Price, 458 F.3d 202 (3d Cir. 2006), does not have any relevance to this argument.

Petitioner has not presented clear and convincing evidence to demonstrate that the factual

determinations of the PCRA court that trial counsel did in fact question Ms. Probst about the

answering machine messages, that Ms. Probst testified that she did not know who was making

the harassing phone calls and that sometimes they occurred when she was talking to Petitioner

on the phone and that Ms. Probst testified that she did not have a trace put on her telephone line

should not be presumed correct.  Petitioner has also failed to demonstrate how he was prejudiced

when counsel questioned Ms. Probst about the messages she left on his machine but did not play

the messages in court or how he was prejudiced when Ms. Probst testified that she did not know

who made harassing phone calls to her and that some of them occurred when she was actually on

the phone with him.  Petitioner has failed to demonstrate that the state courts' decisions are

unreasonable applications of <u>Strickland</u>.  Therefore, as to this claim, the petition will be denied.

<u>Failure to submit alibi evidence</u>

In claim B(3), Petitioner alleges that trial counsel was ineffective for failing to submit

evidence showing that he had an alibi for the June 28, 2000 incident in which Ms. Probst's

parents' house was vandalized, which he contends would have further discredited the state's

theory of the case.  Specifically, Petitioner contends that counsel should have called his sister,

Michelle Kaguyutan, who would have testified that he was at her residence at the time the

vandalism took place.[9]

The PCRA court stated that:

This evidence attempts to provide an alibi for a crime for which the Defendant
was never charged and for which he was not on trial.  All of the charges against
the Defendant arise from the arson that occurred on September 28, 2000.  They

---

[9]      In her affidavit, Michelle Kaguyutan states that Petitioner could not have committed this
act of vandalism because he was with her in Hanover, Pennsylvania at the time it took place.  He
has attached this affidavit to his amended petition.  (Docket No. 5 Ex. D.)  He also mentions it in
his own affidavit.  (Docket No. 5 Ex. B ¶ 5.)

> have nothing to do with any vandalism at Ms. Probst's home on June 28, 2000. Thus, there was no basis for trial counsel to present alibi evidence to a crime that was not the subject of the proceedings. Accordingly, the Court finds no ineffectiveness in this regard.

(Answer Ex. 51 at 5.) The Superior Court affirmed on the basis of Judge O'Toole's opinion. (Answer Ex. 55 at 5.)

Petitioner argues that, even if Ms. Probst did not state that she thought he was responsible for this incident of vandalism, the jury was invited to draw this inference when she testified about it. Thus, he contends that if counsel had proffered evidence that he could not have committed the vandalism, it would have further weakened the Commonwealth's case against him.

As explained above, in order to succeed on this claim, Petitioner must demonstrate that counsel's alleged ineffectiveness fell below an objective standard of reasonableness and that he was prejudiced by this error. Petitioner has not argued that he had alibi evidence for the other acts that preceded the fire, including: the other act of vandalism at Ms. Probst's parents' home;[10] the incident in which she was watching a movie at the house of a male friend when they smelled gasoline outside, the telephone lines were cut and her car was "keyed"; and the fire that occurred at 317 North Craig Street just before Ms. Probst and Jesse Vanko could move into an apartment there. (T.T. 299-310, 323-25.) Thus, Petitioner has not demonstrated that counsel's failure to present alibi evidence with respect to this one incident fell below an objective standard of reasonableness.

---

[10]   In one incident, someone wrote graffiti on a wall outside her parents' house, and in the other, someone ripped out all the plants in the front yard. Ms. Probst did not provide exact dates for either incident and Michelle Kaguyutan's affidavit does not clarify which of the two incidents was the one in which Petitioner was at her house at the time and thus could not have been responsible for it.

26

Moreover, assuming that he could meet the first prong, Petitioner could not meet the

second prong.  As discussed in the state court opinions, trial counsel vigorously attempted to

defend him, first by trying to have his confession excluded, then by trying to have an expert

testify on the issue of false confessions.  When these measures failed, counsel had Petitioner

testify as to the intimidating aspect of the interrogation and counsel cross-examined Detective

McDonald extensively.  Counsel also attacked the contention that the fire was set intentionally

and challenged the state's theory that Petitioner was stalking Ms. Probst.  Considering all of this,

Petitioner has not demonstrated that if counsel had called his sister to testify that he had an alibi

for one of the several incidents of vandalism that preceded the fire (but not for the other ones),

there is a reasonable probability that the result of the proceedings would have been different.

Therefore, as to this claim, the petition will be denied.

### Failure to call character witnesses

In claim C, Petitioner alleges that trial counsel was ineffective for failing to call available

character witnesses to establish his nonviolent reputation.  Specifically, he contends that counsel

should have called his friends, Amber Lisi and Laura Jago, to testify as to his reputation for

nonviolence.  The Superior Court concluded that Petitioner failed to demonstrate that the

absence of these two character witnesses so prejudiced him as to deny him a fair trial:

> Initially, we note that the testimony of these two witnesses, which was
> brief and focused solely on [Kaguyutan's] reputation as a nonviolent person,
> would have been cumulative of testimony which was already before the jury.
> During cross-examination, Carissa Probst testified that she never felt threatened
> by [Kaguyutan], that he was never violent with her, and that even after the break-
> up of their romantic relationship they remained such good friends [that] she
> would stay at his apartment.  ([T.T.] 351, 362, 368.) Thus there was already
> testimony of [his] nonviolent character and we would be hard pressed to conclude
> that the absence of additional cumulative testimony would so prejudice [him] as
> to deny him a fair trial.

Moreover, we agree with the trial court that counsel's trial strategy was reasonable.  Counsel testified that his strategy in this case was: (1) to attack the confession both through suppression and through a proffered expert on false confessions; (2) to attack the incendiary nature of the fire; and (3) to attack the credibility of Ms. Probst.  He gave two reasons for not using character witnesses as to nonviolence: first, that Ms. Probst had already testified that [Kaguyutan] had never been violent or threatening towards her and she had never seen him to be threatening or violent in any manner and, second, that, in his view, this was not the type of violent crime whose defense would benefit from character witnesses as to nonviolence.  We agree with the trial court that such a strategy was reasonable and vigorously pursued and thus counsel's stewardship cannot be assailed on this ground.

(Answer Ex. 40 at 4-5.)

Petitioner argues that the issue of violence was placed before the jury: he was accused of arson and murder, Ms. Probst testified that he was stalking her (even if she did not realize at the time that he was behind all of the incidents that occurred to her) and Michelle Dresbold, a language pattern specialist, testified that his handwriting was similar to that of the disturbed individual who sent a threatening letter to Ms. Probst after the fire.  Thus, he contends that favorable character evidence would have been quite beneficial in countering the Commonwealth's case against him.

At the evidentiary hearing, Attorney Gerson testified as to his three-part strategy with respect to the case: he attacked the incendiary nature of the fire, challenged Petitioner's "confession" as being the result of coercion and raised the issue that Carissa Probst never thought she was being stalked by Petitioner and in fact considered him a close friend.  (Evid. Hr'g at 6, 10.)  When asked if evidence concerning Petitioner's reputation for being nonviolent would have been consistent with his strategy, counsel said no:

One of the difficulties I had is that in arguing to the jury in conclusion of the case, I hammered home very hard about there not being an arson.  If there was no arson, there is no motive.  If there is no motive, there is no crime.

28

> I think for me to get into a situation where I am arguing to a jury about the nonviolent aspect of Matthew is like trying to play both sides. I just didn't think that was appropriate....

(Evid. Hr'g at 23.)

Petitioner contends that failing to call character witnesses was a poor strategic choice on counsel's part. However, the Court of Appeals has stated that "Strickland and its progeny make clear that counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 466 U.S. at 689).

Petitioner has not demonstrated that the Superior Court's conclusion that trial counsel had a reasonable basis for not calling character witnesses as to his reputation for non-violence was an unreasonable application of Strickland. Moreover, Ms. Probst–the intended victim in this case–testified that he did not have a reputation for violence, even after she broke off their romantic relationship. Petitioner has not demonstrated how he was prejudiced when counsel failed to call two additional witnesses to confirm this reputation. Therefore, as to this claim, the petition will be denied.

<u>Failure to object to jury instructions</u>

In claim D, Petitioner alleges that trial counsel was ineffective for failing to object to the jury instructions. Specifically, he contends that counsel should have raised the fact that no jury instruction informed the jury that it could disregard the confession if it was not voluntarily entered. The PCRA court concluded that:

> a review of the Charge of the Court, as a whole, convinces the Court that the instructions were accurate and they provided the jury with the applicable law and legal definitions. Specifically, the Court's instructions on reasonable doubt and the jury's use of the Defendant's confession were lengthy and precise. In addition, contrary to the Defendant's allegation, the Court did not violate Rule

29

646 with regard to his confession.  The Rule prohibits the jury from having a copy of any written confession during their deliberations.  A copy of the confession was provided to the jurors for a period of seven (7) minutes while they were being re-instructed on certain areas of the law and not while they were in the jury room deliberating.  Thus, the Court finds no ineffectiveness with regard to trial counsel's failure to object to the jury charge or the jury's review of the Defendant's confession.

(Answer Ex. 51 at 6.)  The Superior Court affirmed on the basis of Judge O'Toole's opinion.

(Answer Ex. 55 at 5.)

The Supreme Court has stated that:

> In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. See Sandstrom v. Montana, 442 U.S. 510, 520-521, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction ... so infected the entire trial that the resulting conviction violates due process.' " Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " Boyde v. California, 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (quoting Cupp, supra, at 146-147, 94 S.Ct. 396). If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, supra, at 72, 112 S.Ct. 475 (quoting Boyde, supra, at 380, 110 S.Ct. 1190).

Middleton v. McNeil, 541 U.S. 433, 437 (2004).

Petitioner described his underlying claim only in terms of state law and did not argue that the allegedly erroneous jury instruction violated his constitutional rights.  In fact, he specifically argued that the jury instructions were improper under Pennsylvania law and that the trial court violated Pennsylvania Rule of Criminal Procedure 646, which prohibits the jury from taking a copy of any confession with it when it retires to deliberate.  The Superior Court, adopting Judge O'Toole's opinion, rejected these claims.

Petitioner argues that the jury instruction told the jury that it could consider the confession if it found that he made it voluntarily, but it did not tell the jury that it should not consider the confession if was not made voluntarily or that the Commonwealth bore the burden of proving that the confession had been made voluntarily.  However, he has not cited any authority to support the argument that this omission rose to the level of a due process violation in that the instruction so infected the entire trial that the resulting conviction violates due process.

Respondents point out that the trial court's jury instruction closely tracked Pennsylvania Suggested Standard Criminal Jury Instructions 3.04B, 3.04C and 3.05.  As a whole, the charge instructed the jury that it should consider all of the facts and circumstances surrounding the making of his statement to determine if it was a product of essentially a free will and choice and not of a choice overburdened by pressure.

Petitioner has not presented clear and convincing evidence to demonstrate that the factual determination of the PCRA court that the jury instruction closely tracked the Pennsylvania Suggested Standard Criminal Jury Instructions should not be presumed correct.  He has failed to demonstrate how trial counsel was ineffective for failing to object to the jury instructions or how he was prejudiced thereby.  Petitioner has failed to demonstrate that the state courts' decisions are unreasonable applications of <u>Strickland</u>.  Therefore, as to this claim, the petition will be denied.

<u>Evidentiary hearing</u>

Petitioner argues that he is entitled to an evidentiary hearing.  He contends that, if a hearing is not held, the Court must accept his allegations as true "unless they are clearly frivolous on the basis of the existing record."  <u>Government of the Virgin Islands v. Bradshaw</u>, 726 F.2d 115, 117 (3d Cir. 1984).  However, that case concerned the standard for holding an

evidentiary hearing in a § 2255 case, it has since been modified in light of <u>Strickland</u>, <u>see</u> <u>United</u>

<u>States v. Dawson</u>, 857 F.2d 923 (3d Cir. 1988), and it has no bearing on a § 2254 petition

governed by AEDPA.

   The Court of Appeals recently summarized the standards for holding an evidentiary

hearing in a habeas case challenging a state court conviction:

> "Prior to AEDPA, new evidentiary hearings [in habeas cases] were
> <u>required</u> in several circumstances." <u>Campbell v. Vaughn</u>, 209 F.3d 280, 286 (3d
> Cir. 2000) (citing <u>Townsend v. Sain</u>, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d
> 770 (1963)) (emphasis in original). We have been clear that "AEDPA, in contrast,
> <u>permits</u> evidentiary hearings on habeas review, but only in a limited number of
> circumstances." <u>Id.</u> (citing 28 U.S.C. § 2254(e)) (emphasis in original). In
> particular, a district court is permitted to hold an evidentiary hearing on a claim
> asserted in a § 2254 petition so long as such a hearing is not barred by 28 U.S.C.
> § 2254(e)(2). Under that section, a habeas court is barred from holding an
> evidentiary hearing unless the petitioner was diligent in his attempt to develop a
> factual basis for his claim in the state court proceedings, <u>see</u> <u>Williams v. Taylor</u>,
> 529 U.S. 420, 430, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); <u>Wilson v. Beard</u>, 426
> F.3d 653, 665 (3d Cir. 2005), or the petitioner satisfies the criteria set forth in
> § 2254(e)(2)(A) and (B).
>
> "In cases where an applicant for federal habeas relief is not barred from
> obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant
> such a hearing rests in the discretion of the district court." <u>Schriro</u> [ v. Landrigan],
> 550 U.S. [465,] 468 [(2007)]; <u>see also</u> <u>Campbell</u>, 209 F.3d at 287 ("AEDPA,
> unlike <u>Townsend</u> and [<u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 112 S.Ct. 1715, 118
> L.Ed.2d 318 (1992)], does not require that such a hearing be held. Instead, federal
> courts have discretion to grant a hearing or not."). Although such a decision is
> discretionary, it is not unconstrained, and <u>Schriro</u> identifies two related
> considerations that guide the habeas court's exercise of discretion.
>
>    First, in determining whether or not to hold an evidentiary hearing, courts
> should "consider whether such a hearing could enable an applicant to prove the
> petition's factual allegations, which, if true, would entitle the applicant to federal
> habeas relief." <u>Schriro</u>, 550 U.S. at 474. In other words, courts considering the
> appropriateness of an evidentiary hearing should determine whether the petition
> presents a <u>prima facie</u> showing which, if proven, would enable the petitioner to
> prevail on the merits of the asserted claim. <u>See, e.g.</u>, <u>Campbell v. Burris</u>, 515 F.3d
> 172, 184 (3d Cir. 2008); <u>Wells v. Petsock</u>, 941 F.2d 253, 259 (3d Cir. 1991);
> <u>Smith v. Freeman</u>, 892 F.2d 331, 338 (3d Cir. 1989). The reasons underlying such
> a consideration are self-evident–given "AEDPA's acknowledged purpose of

reducing delays in the execution of state and federal criminal sentences," <u>Schriro</u>, 550 U.S. at 475 (quotation marks, citations, and brackets omitted), a court should be reluctant to convene an evidentiary hearing to explore the claims of a petitioner whose pleadings are factually insufficient to suggest any entitlement to habeas relief. <u>See, e.g.</u>, <u>Campbell</u>, 515 F.3d at 184 ("bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing") (quoting <u>Mayberry v. Petsock</u>, 821 F.2d 179, 185 (3d Cir. 1987)); <u>Anderson v. Att'y Gen. of Kansas</u>, 425 F.3d 853, 858-59 (10th Cir .2005) (to warrant an evidentiary hearing, a habeas petitioner's "factual allegations must be specific and particularized, not general or conclusory") (quotation marks and citation omitted).

        Second, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Schriro</u>, 550 U.S. at 474. That is, even if the factual allegations in the habeas petition are sufficient to make out a <u>prima</u> <u>facie</u> claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are "contravened by the existing record." <u>Id.</u> (citation omitted); <u>see also</u> <u>Campbell</u>, 209 F.3d at 290. As the Supreme Court has explained, "[i]f district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." <u>Schriro</u>, 550 U.S. at 475.

<u>Palmer v. Hendricks</u>, 2010 WL 282086, at *5-6 (3d Cir. Jan. 26, 2010) (footnotes omitted).

In this case, Petitioner was diligent in his attempt to develop a factual basis for his claims in state court, as he submitted affidavits and requested that a hearing be convened on his claim. <u>Palmer</u>, 2010 WL 282086, at *6 n.4.  However, for the reasons explained above, he has not presented a prima facie showing which, if proven, would enable him to prevail on the merits.  As in <u>Palmer</u>, Petitioner's claims allege ineffectiveness of trial counsel and, as in that case, Petitioner has failed to make a showing of prejudice.  Therefore, a hearing would not serve any purpose and this Court will not exercise its discretion to hold one.

<u>Certificate of Appealability</u>

The decision whether to grant or deny a certificate of appealability is "[t]he primary means of separating meritorious from frivolous appeals."  <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893

(1983).  If a certificate of appealability is granted, the Court of Appeals must consider the merits of the appeal.  However, when the district court denies a certificate of appealability, the Court of Appeals can still grant one if it deems it appropriate.  28 U.S.C. § 2253.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This petition does not present a substantial showing of the denial of a constitutional right.  Accordingly, a certificate of appealability will be denied.

An appropriate order follows.

Dated: February 5, 2010

LISA PUPO LENIHAN
U.S. Magistrate Judge

34